IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS
MIDLAND DIVISION

| | | |
|---|---|---|
| In re: | § § | |
| ANIMAS WELL SERVICES, LLC, | § § | Case No. 15-70162-RBK |
| | § | (Chapter 11) |
| Debtor. | § § § | |

**DECLARATION OF JAMES J. OSBORNE
IN SUPPORT OF DEBTOR'S FIRST-DAY MOTIONS**

I, James J. Osborne, under penalty of perjury, declare as follows:

1. "On November 24, 2015 (the "Petition Date"), Animas Well Services, LLC (the "Debtor"), as debtor and debtor-in-possession, commenced the above-referenced and numbered case (the "Bankruptcy Case") under Chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et al.* (the "Bankruptcy Code") in this Court (the "Bankruptcy Court"). I am an officer of the Debtor, and, in that capacity, I am authorized to submit this *Declaration of James J. Osborne in Support of Debtor's First-Day Motions* (the "Declaration") on behalf of the Debtor. As both and officer and an employee of the Debtor, I am familiar with the day-to-day operations, business, and financial affairs of the Debtor.

2. I have been advised by counsel that the Debtor continues to operate its business and manage its properties as a debtor-in-possession, pursuant to sections 1107 and 1108 of the Bankruptcy Code, in order to maximize the Debtor's bankruptcy estate (the "Estate") for the benefit of its creditors and stakeholders in accordance with the Debtor's fiduciary obligation.

3. I submit this Declaration to assist the Bankruptcy Court and other parties-in-interest in understanding the circumstances that compelled the commencement of the Bankruptcy Case and in support of the Debtor's first-day motions. Except as otherwise indicated, all facts set

---

DECLARATION OF JAMES J. OSBORNE IN SUPPORT OF DEBTOR'S FIRST-DAY MOTIONS – Page 1

forth in this Declaration are based upon my personal knowledge, my review of the relevant documents, or my opinion based on my experience, knowledge, and information concerning the operations and financial affairs of the Debtor. If I were compelled to testify, I would testify competently to the facts set forth in this Declaration.

## I. GENERAL OVERVIEW

4. The Debtor owns and operates as an oil and gas services company that specializes in contracting workover rig services to oil and gas companies in the Permian Basin. Headquartered in Midland, Texas, the Debtor began its operations in August 2005 and has approximately twenty-seven (27) employees. Currently, the Debtor owns and contracts ten (10) workover rigs. From its operations, the Debtor has generated substantial annual revenues of between $5 and $7 million over the last three (3) years. While the Debtor's business has operated successfully, with the Debtor being generally current on its various obligations, the recent collapse of oil prices and corresponding downturn in the overall oil and gas industry has affected the Debtor's financial performance, ultimately resulting in its bankruptcy filing.

5. The Debtor generally has positive relationships with its creditors, including Commercial State Bank ("CSB") and Nations Fund I, Inc., ("Nations"), commonly known as Nations Equipment Finance. In addition, demand for the Debtor's workover rig services among its current and prospective customer base actually exceeds the Debtor's current operational capacity. However, the Debtor lacks sufficient capital to expand its operations in order to satisfy demands, and the Debtor's primary loan obligations of approximately $4.2 million—of around $5.7 million in total lender indebtedness—matured more than one (1) year ago. BaseLine Capital, Inc. ("BaseLine"), the Debtor's primary lender, has refused to extend the terms of the Debtor's obligations or otherwise restructure the Debtor's primary loan obligations, absent terms

and conditions that would in essence cede control over Debtor's operations and management. This, combined with the current down-cycle in the oil and gas industry, forced the Debtor to seek bankruptcy protection in order to restructure its debts, reorganize its business, preserve going concerns, and maximize returns for all creditors and stakeholders.

## II. FACTS IN SUPPORT OF FIRST-DAY MOTIONS

### A. CASH COLLATERAL MOTION

6. It is my belief that BaseLine, CSB, and Nations (each a "Lender"; and, collectively, the "Lenders") each claim interests in various types of collateral that constitute Cash Collateral, including, in particular, the Debtor's receivables derived from contracting its workover rig services. While the Debtor's review and analyses of each Lender's legitimate interest in Cash Collateral is ongoing and, subject to the Debtor's reservation of its rights to contest such interests at a later date, I believe that the Lenders have a colorable claim to interests in Cash Collateral.

7. Without authorization to use Cash Collateral, the Debtor cannot use its funds and presently has no other source of funds to finance its operations, maintain its businesses, and protect its properties. The Debtor has an immediate, urgent, and ongoing need for the use of its present and future cash. Among other things, the Debtor has an ongoing need to: (i) pay for upkeep and maintenance of its workover rigs; (ii) pay its employees' wages and benefits; (iii) maintain insurance coverages; (iv) pay for all of the various services and goods necessary to operate and run its business; and (v) pay costs related to its reorganization efforts, including professional fees and U.S. Trustee fees.

8. Without the use of its cash, the Debtor's business would be over, and the Bankruptcy Case and the prospect of a successful reorganization dead—to the permanent

prejudice of the Debtor, the Estate, and all creditors and parties-in-interest, including BaseLine, which would be left with workover rigs and other personal property subject to a multitude of taxes and other obligations in a market that is oversaturated with such property.

9. The Debtor has carefully prepared its interim cash collateral budget (the "Interim Budget"), a true and correct copy of which is attached to the *Debtor's Emergency Motion for Interim and Final Usage of Cash Collateral* [Docket No. 8], to demonstrate that it can operate within fixed budgeted amounts, while still cash flowing and providing adequate protection for the usage of Cash Collateral, in the form of, among other things, generating even more Cash Collateral.

10. A refusal to permit the Debtor to use Cash Collateral for said fourteen (14) days will lead to immediate and irreparable injury, since the Debtor cannot go fourteen (14) days without paying vendors, employees, and a whole host of other services and costs. In fact, it would lead to the end of the Debtor and a viable business, and the ultimate death of this Bankruptcy Case.

11. In terms of adequate protection, the Lenders will be adequately protected because: (i) the Debtor's usage of Cash Collateral will lead to increased Cash Collateral, therefore increased collateral as a whole; (ii) the Debtor's usage of Cash Collateral will protect, preserve, maintain, safeguard, and enhance the Lenders' respective physical collateral; (iii) the Debtor's usage of Cash Collateral will be limited to the purposes and amounts provided in the Budgets; and (iv) the Debtor proposes to grant the Lenders liens in accordance with existing prepetition priorities in Cash Collateral, including all postpetition property in which each such Lender has a prepetition lien or interest, except for Chapter 5 causes of action and approved Interim Budget

and final budget expenses and accruals, to the extent of any diminution in the value of Cash Collateral resulting from the Debtor's usage thereof.

B. **MOTION TO HONOR PREPETITION EMPLOYEE COMPENSATION AND BENEFITS**

12. As mentioned, the Debtor averages approximately (27) staff members employed to run and operate the Debtor's business at its headquarters in Midland, Texas and out on multiple job sites across the state. However, this figure does not account for the fact that, during the past few weeks, the Debtor lost four (4) to six (6) employees, and hired four (4) to six (6) other employees to replace them. Thus, the Debtor will have thirty-four (34) employees (each an "Employee" and, collectively, the "Employees") to account for the upcoming payroll (yet averages approximately twenty-seven employees). The Debtor in turn provides compensation and benefits in the ordinary course of business. After waiting a period of three (3) months, each Employee is provided medical and health benefits (collectively, "Health Benefits"), which the Debtor pays on behalf of each Employee. The Debtor makes bi-monthly payments in arrears for those amounts not covered by deductibles or co-payments. The percentage of employees of the Debtor receiving Health Benefits is nearly one hundred (100%) percent.

13. The Debtor pays its employees bi-weekly on Fridays through the use of checks and direct deposits. The last estimated prepetition payday for most Employees was for wages earned from November 2, 2015 through November 13, 2015. It is therefore possible, though unlikely, that there are uncashed payroll checks outstanding as of the Petition Date.

14. In the ordinary course of business, in each pay period, Employees' compensation is deducted for obligations such as federal income taxes, FICA, FUTA, Medicare, social security, insurance premiums (if Employee opts for additional coverage), and child support (collectively, the "Payroll Deductions"). The amounts deducted are then remitted to the relevant insurance

company or governmental authority. As of the Petition Date, the Debtor has remitted some, but not all, of the Payroll Deductions to the various insurance providers or governmental authorities.

15. To the extent that any such funds have not been collected or remitted to the appropriate insurance company or governmental authority, such funds are not property of the Estate. To the extent that such funds relate to prepetition periods, the Debtor should be allowed to continue to collect and remit the applicable Payroll Deductions in accordance with the Debtor's regular policies and procedures and in the ordinary course of business.

16. The Debtor seeks authority to (i) pay outstanding prepetition wages, (ii) pay outstanding prepetition premiums, fees, and other amounts relating to the Health Benefits, and (iii) satisfy other prepetition miscellaneous benefits, including reimbursement of cell phone costs, customary expenses, auto allowances, and other miscellaneous but nonmaterial benefits normally paid in the Debtor's ordinary course of business (the "Miscellaneous Benefits," and, together with the Health Benefits and all other benefits listed above, the "Employee Benefits").

17. As of the Petition Date, no employee is owed more than the $12,475 limit established by section 507(a)(4) of the Bankruptcy Code in prepetition wages, and that all of the Employee Benefit obligations (together with accrued but unpaid Employee wages, the "Employee Obligations") will fall under the limit established by section 507(a)(5) of the Bankruptcy Code.

18. Prepetition wages are owed to approximately thirty-four (34) Employees. The Debtor estimates that Employee Obligations for total unpaid wages earned through November 23, 2015 are significantly less than the maximum allowed under section 507(a)(4) of the Bankruptcy Code. Indeed, no Employee is owed more than $12,475 for prepetition wages earned through November 23, 2015.

19. It is essential that the Debtor immediately establish the standard of treatment for the Employee Obligations. Any delay in paying the Employee Obligations will adversely affect the Debtor's relationship with its Employees and could irreparably impair Employee morale at the very time when the dedication, confidence, and cooperation of its Employees are most crucial. The Debtor faces the imminent risk that its operations may be severely impaired if it is not immediately granted authority to make payments described in this Motion. Employee support for Debtor's reorganization effort is crucial, particularly given the importance of Employee morale and initiative in that effort. At this critical early stage, the Debtor simply cannot risk the substantial disruption to its business operations that will result if the Debtor is not permitted to pay the Employee Obligations in the ordinary course of business. Because of the specialized nature of the Debtor's business, its Employees possess specialized knowledge that cannot be easily or cheaply replaced.

20. Not paying Employees in the ordinary course of business would cause severe hardship on them and their families. Additionally, if the Debtor is unable to assure Employees will be paid in a timely manner, or if the Employees are not immediately assured of the uninterrupted, critical wage and benefit payments of which they are reliant upon the Debtor's operations could suffer immediate and irreparable harm due to Employee resentment, resignations, loss of good will, and disruption of Employee morale. Replacing disgruntled Employees at this juncture would be expensive, time-consuming, and disruptive at best.

21. Granting the relief requested in *Debtor's Emergency Motion to Honor Prepetition Employee Compensation and Benefits* [Docket No. 9] will also reduce the administrative burden that otherwise might occur in the Bankruptcy Case, as the Debtor will not be tasked with determining to what extent individual Employees hold priority or general

unsecured claims for unpaid wages. Allowing the Debtor to focus on its reorganization efforts, rather than on the administrative tasks of segregating and administering claims created by unpaid Employee wages will be advantageous to the Estate, and will allow for a more efficient and effective reorganization.

22. Payment of Employee Obligations in accordance with the Debtor's prepetition business practices and the continuation of such practices on a postpetition basis is in the best interests of the Debtor and its Estate, and will enable the Debtor to continue to operate its businesses in an economic manner without disruption. Indeed, the Employees are central to the Debtor's operations and are vital to maintaining and maximizing the Debtor's Estate.

23. A significant deterioration in the Employees' morale at this critical time undoubtedly would have a substantial adverse impact on the Debtor and the value of its assets and businesses. The Debtor submits that the total amount to be paid if the authorization sought herein is granted is relatively modest compared with the size of the Debtor's Estate and the importance of these individuals to the Debtor and its Estate. Moreover, the continuation of the Employee Obligations after the Petition Date will be factored into the Debtor's budget for post-filing operations.

24. The relief sought in the *Debtor's Emergency Motion to Honor Prepetition Employee Compensation and Benefits* [Docket No. 9] is critical to the Debtor achieving a smooth transition to operating as a Chapter 11 debtor and will help preserve its going-concern value. The relief sought is essential to the Debtor's reorganization, and without such relief, the Debtor will suffer immediate and irreparable harm. Indeed, without such relief, some Employees may cease working and attempt to find other employment. Additionally, all creditors and parties-in-interest will be harmed by the rapid diminution of Debtor's Estate and going-

concern value. In short, the Debtor faces the risk that its operations may be severely impaired if the relief requested by the Debtor in the *Debtor's Emergency Motion to Honor Prepetition Employee Compensation and Benefits* [Docket No. 9] is not granted immediately.

## C. CRITICAL VENDOR MOTION

25. In the ordinary course of its business, the Debtor purchases services and/or goods from certain vendors or suppliers whose continued, uninterrupted provision of such services and/or goods will play a crucial role in maintaining the Debtor's ongoing business operations and facilitating an orderly transition into conducting its operations as a debtor-in-possession (each such vendor and/or supplier a "Critical Vendor"; collectively, the "Critical Vendors"). The Critical Vendors generally provide a variety of services and goods relating to the daily tasks associated with the Debtor providing workover rig services to oil and gas companies.

26. In the course of identifying vendors whose services would render them an indispensable Critical Vendor, the Debtor considered a number of criteria including (i) whether it is critical for the Debtor to deal directly with a particular vendor; (ii) whether the Debtor can find similar, alternative vendors providing similar services and/or goods within a reasonable timeframe; (iii) in the case of vendors furnishing goods, whether the Debtor has a quantity of goods stored in order to allow it to continue its operations until a replacement vendor was located, and (iv) the impact on the Debtor's business operations, production activities, and revenues if the vendor refused to continue serving the Debtor.

27. The Debtor compiled a list of its vendors it believes to be critical in maintaining its operations while reorganizing in Chapter 11. A true and correct copy of the list is attached to *Debtor's Emergency Motion for Order Authorizing the Debtor to Pay Certain Critical Vendors*

[Docket No. 10] as Exhibit "A". The Debtor is currently making inquiries to alternate suppliers, while contemporaneously negotiating with its current vendors.

28. The impact upon the Debtor's operations in the event that any Critical Vendor were to cease providing services and/or goods to the Debtor would be significant. Without the continued services of and supplies from the Critical Vendors, the Debtor may be forced to suspend or even cease its activities all together, which would ultimately serve as the death knell for the Debtor's business operations. Failure to pay certain prepetition Critical Vendor claims will cause the Debtor to suffer immediate, irreparable harm in that nonpayment will kill the Debtor's business operations to the detriment of the Debtor's Estate and its creditors and stakeholders.

29. In an effort to ensure that the payment of each Critical Vendor claim provides the Debtor with a benefit to its Estate, the Debtor may request that any Critical Vendor receiving payment pursuant to such Order (such payment, hereinafter a "Critical Vendor Payment") be required, to the extent applicable, to execute an agreement (a "Trade Agreement") whereby it agrees to provide the Debtor with: (i) the continuance of the parties' existing business relationship; (ii) other business terms on a postpetition basis consistent with past practices, including the pricing of services and goods and the provision of equivalent levels of service, on terms at least as favorable as those extended in the normal course prior to the Petition Date, or on such other terms that are acceptable to the Debtor; and (iii) the release to the Debtor of goods, assets, and/or services that were in transit as of the Petition Date from the Critical Vendor to the Debtor (collectively (i) – (iii), the "Trade Terms"). The Trade Terms would be applicable throughout the pendency of this Bankruptcy Case.

30. If a Critical Vendor that has executed a Trade Agreement accepts a Critical Vendor Payment and fails to provide the Debtor with the requisite Trade Terms specified therein, then the Debtor may request that (a) any Critical Vendor Payment received by the Critical Vendor be deemed by the Debtor as an unauthorized postpetition transfer under 11 U.S.C. § 549 of the Bankruptcy Code that the Debtor may (i) recover from the Critical Vendor in cash or (ii) at the Debtor's option, apply against any outstanding administrative claim held by such Critical Vendor; and (b) upon recovery of any Critical Vendor Payment, the corresponding prepetition claim of the Critical Vendor will be reinstated in the amount recovered by the Debtor.

31. Should any of the Critical Vendors cease doing business with the Debtor, or become unable to do business with the Debtor due to the nonpayment of prepetition debt, the Debtor could be forced to cease or suspend operations, choking off its primary revenue source, leaving it at risk of civil and regulatory liability, and imparting a devastating impact on the Debtor's going concern value. Such damage to the Debtor's going concern value would far exceed the amount of Critical Vendor Payments that the Debtor has sought approval for through this Motion.

32. Thus, the Debtor's other creditors will not be harmed, and will actually fare better, if the Debtor is authorized to make the limited Critical Vendor Payments sought in this Motion to ease the Debtor's transition into Chapter 11 bankruptcy and minimize disruptions.

33. As stated, paying Critical Vendors is necessary to prevent immediate and irreparable harm to the Debtor's operations that would be associated with any interruption of its business operations, and to ensure that the Debtor is able to preserve the going-concern value of its Estate during its transition into Chapter 11 bankruptcy. If this Court does not allow the Debtor to make payments to Critical Vendors, the Debtor will suffer immediate and irreparable

harm in that its business operations will likely come to a complete standstill, and revenues will thus cease to exist to the direct detriment of the Debtor's Estate and its creditors and stakeholders.

### D. MOTION TO MAINTAIN CASH MANAGEMENT SYSTEM

34. Prior to the Petition Date, the Debtor maintained a cash management system (the "Cash Management System"). The Cash Management System functions as follows:

    a. the Debtor controls three (3) bank accounts, all of which are maintained at CSB; (1) one operating account; (2) one payroll account; and (3) one money market account;

    b. the Debtor also utilizes a MasterCard with Citibank and fuel cards with Wright Express n/k/a WEX, Inc. (WEX");

    c. with respect to the operating account, the operating account is used by the Debtor to deposit revenue received, primarily from customers for services performed by the Debtor, and the account is also used for payment of operating expenses, including those expenses incurred in the ordinary course of business and payments made to vendors;

    d. with regards to the payroll account, monies are periodically swept into the payroll account from the Debtor's operating account, which funds are then used to pay payroll to the Debtor's employees and to cover relevant taxes;

    e. in terms of the MasterCard, the Debtor regularly uses this credit card to transact a majority of its vendor purchases with respect to those vendors on which the Debtor is on a cash basis, and the Debtor also regularly uses the credit card to make several reoccurring vendor payments through the credit card's automatic payment; and

    f. as for the fuel cards with WEX, the fuel cards are utilized by the Debtor's employees who regularly operate vehicles and/or any other equipment which are gasoline powered; the Debtor's use of the fuel cards permit the Debtor to track and monitor fuel costs, as well as to ensure that fuel expenses are limited to the purchase of gasoline.

35. This Cash Management System, which I contend is standard and routine, helps ensure: (i) that the Debtor's management has control and access over the Debtor's finances; (ii) that the Debtor's management is able to accurately and quickly gauge the cash flow and

profitability of the Debtor; and (iii) that the Debtor's management can control operating expenses and other costs.

36. Accordingly, the continued use and implementation of the Cash Management System is in the best interests of the Estate, will help to ensure as smooth a transition into bankruptcy as is possible, and will facilitate the Debtor's reorganization, while at the same time protect the interests of all creditors because of the strict controls built into the Cash Management System.

37. The Debtor will promptly begin the process of opening U.S. Trustee-approved DIP accounts, and it believes that its anticipated DIP bank will be able to implement the current Cash Management System. The Debtor's accounts will be approved DIP accounts.

38. However, this process may take time, and it will take time for the Debtor to transfer funds from CSB into the new DIP accounts. In the meantime, the Debtor will have postpetition obligations to fund its continuing business operations. Accordingly, to ensure that the Debtor has access to its funds prior to completing the process of opening its DIP accounts, the Debtor requests authority to continue using its prepetition bank accounts for a maximum period of three (3) weeks from the Petition Date. The Debtor will only pay postpetition and Court-approved obligations from its prepetition accounts and will commence using DIP accounts as soon as that process is completed.

39. To accommodate the transition, CSB should not, prior to receiving approval from this Court, be permitted to close the Debtor's bank accounts or set off any prepetition claims or debts owed to CSB by the Debtor With respect to any checks issued prior to the Petition Date and outstanding, the Debtor should be able to authorize CSB to cancel all such checks except for any checks associated with expenses or costs that the Court grants the Debtor

authority to pay (the "Authorized Payments"), and CSB should honor any checks for the Authorized Payments. As for the Debtor's MasterCard and WEX fuel cards, the Debtor's MasterCard with Citibank (or any division or affiliate thereof) and WEX fuel cards should remain active, and WEX, MasterCard, or Citibank should be prohibited from deactivating such cards or associated account(s) because of the Bankruptcy Case or the prepetition claims or debts owed by the Debtor, absent prior approval from this Court.

40. The closing of the Debtor's bank accounts, set off of the Debtor's funds, or the deactivation of the Debtor's MasterCard or WEX fuel cards would cause the Debtor's operations to immediately come to a halt, significantly reduce the Debtor's future revenues and going-concern value, and kill the Debtor's chances of reorganizing under Chapter 11 to the detriment of the Debtor's Estate and its creditors. Accordingly, the failure of the Debtor to obtain the relief requested in this Motion would cause immediate and irreparable harm to the Debtor.

E. **WRIGHT/WEX BANK FUEL CARD MOTION**

41. The Debtor uses six (6) diesel-powered rigs (the "Diesel Rigs") and approximately twenty-four (24) trucks (the "Fleet") in the ordinary course of the conduct of its business. Prior to the commencement of this case, the Debtor utilized WEX Bank charge cards primarily to provide diesel fuel to power its Diesel Rigs and to provide fuel, oil, and other automotive items for its Fleet. WEX Bank is an FDIC-insured depository institution and a lending provider of commercial fleet charge card services in the United States and accepted at more than 180,000 WEX Network locations nationwide including 15,024 location in Texas. The WEX Bank charge card is unique in that it not only allows drivers to obtain fuel for the Fleet; it also enhances the ability of management to monitor, track, and review fuel consumption and other purchases and prevent abuse. WEX Bank also offers other benefits,

DECLARATION OF JAMES J. OSBORNE IN SUPPORT OF DEBTOR'S FIRST-DAY MOTIONS – Page 14

such as monitoring performance with odometer tracking and reports along with the ability to obtain security and control with the advanced purchase alerts and controls.

42. Shortly after the commencement of this Bankruptcy Case, WEX Bank advised the Debtor that WEX Bank would not continue to provide credit unless the Debtor (a) obtained Court approval for WEX Bank to be considered a critical vendor in order to satisfy WEX Bank's prepetition debt; (b) provided a post-petition security deposit (the "Deposit") to open a new account, pursuant to the terms of that certain *Deposit Agreement*, a true and correct copy of which is attached hereto as Exhibit "A" and is incorporated herein for all purposes; and (c) obtained Court approval of the Debtor's continued payment postpetition.

43. The Debtor is also willing to agree, subject to Bankruptcy Court approval, that the automatic stay shall not apply to WEX Bank's application of Deposit to pay postpetition amounts owing by the Debtor under the Deposit Agreement.

44. It is in the sound business judgment of the Debtor to enter into the Deposit Agreement and post the Deposit. Failure to do so could result in significant disruption to the Debtor's business operations by requiring an immediate alternative arrangement for powering the Diesel Rigs and charging fuel, oil, and other automotive items for the Fleet and by crippling the Debtor's operations until such an arrangement could be made.

45. The Debtor has attempted but was unable to obtain postpetition charge-card credit on an (a) unsecured basis pursuant to sections 364(a) and (b) of the Bankruptcy Code or (b) unsecured superpriority basis pursuant to section 364(c) of the Bankruptcy Code.

46. Debtor's Diesel Rigs and Fleet utilize WEX Bank's charge cards for fuel. Without fuel, Debtor's Diesel Rigs cannot operate and its Fleet cannot be used to transport employees and materials to job sites, which would result in an inability of the Debtor to

perform under most of its existing contracts. Under such circumstances, the Debtor would be unable to create revenue postpetition, thus eviscerating any going-concern value, which of course would cause the Debtor to cease its operations to the detriment of the Estate, unsecured creditors, and equity. As compared to losing Debtor's going-concern value, curing WEX Bank's prepetition claim of approximately $19,000.00 as a critical vendor and allowing approximately a $10,000 deposit is clearly not detrimental to the Estate. In addition, the Debtor has assessed its ability to make alternative arrangements to obtain fuel cards from competitors of WEX Bank. Competitors, however, would not be able to issue postpetition charge-cards for at least one to two weeks. By then, most of the customers who have contracted with the Debtor will have taken the position that the Debtor was unable fulfill the terms of its contractual obligations by not providing functional rigs and its labor force. Again, the results would be devastating to the Debtor's business, the Estate, and creditors, as it would lead to the Debtor's liquidation and loss of significant going-concern value. Aside from this Court granting the relief requested by the Debtor in its cash management motion [Docket No. 12], the Debtor does not believe there is another practical or legal alternative by which it can avoid satisfying WEX Bank's demands.

47. Without this relief, the Debtor will probably be forced to discontinue its operations since it will be unable to fuel its Diesel Rigs and Fleet and, thus, perform under its existing contractual obligations. Without ongoing operations and timely performance under its existing leases, the Debtor will lose its going-concern value. Accordingly, with the exception of the relief requested in the cash management motion [Docket No. 12], the Deposit Agreement is the best available option for the Debtor at this time.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct."

Executed this 1ST of December 2015.

By: *[signature]*
James J. Osborne

---

DECLARATION OF JAMES J. OSBORNE IN SUPPORT OF DEBTOR'S FIRST-DAY MOTIONS – Page 17